**Donald G. WISE, Administrator of the Estate of Jennifer Evans, Deceased, Edd A. Evans, Jr. and Delores P. Evans, Parents of Jennifer Evans, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Billy Joe Brown, Dustin A. Turner, Virginia Hotel Corporation, and Radisson Hotels International, Incorporated, Defendants.**

No. 2:97CV610.

United States District Court, E.D. Virginia, Norfolk Division.

June 9, 1998.

**538**

Donald Grant Wise, Portsmouth, VA, Melvin Jay Radin, Norfolk, VA, for plaintiffs.

Michael A. Rhine, Assistant U.S. Attorney, Norfolk, VA, for defendant USA.

Jamie A. Stalnaker, Williams, Kelly & Greer, Norfolk, VA, for defendants Virginia Hotel Corp. and Radisson Hotels International, Inc.

## OPINION

REBECCA BEACH SMITH, District Judge.

This matter is before the court on various dispositive motions: defendant United States' motions to dismiss; defendant Virginia Hotel Corporation's motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; defendant Radisson Hotels International, Incorporated's motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and, a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, filed jointly by defendants Virginia Hotel Corporation and Radisson Hotels International, Incorporated. For the reasons stated below, the court **GRANTS** defendant United States' motions to dismiss, and **GRANTS** the motion for summary judgment filed jointly by defendants Virginia Hotel Corporation and Radisson Hotels International, Incorporated.

### I. Factual and Procedural History

On the night of June 18, 1995, Jennifer Evans was a patron of the Bayou Lounge, a bar located in the Radisson Virginia Beach Hotel, which at all relevant times was owned, operated and supervised by defendant Virginia Hotel Corporation ("VHC"). Defendant Radisson Hotels International, Incorporated ("Radisson") had general supervision over defendant VHC.[1] Defendants Dustin A. Turner ("Turner") and Billy Joe Brown ("Brown") were also patrons of the Bayou Lounge that night. While at the Bayou Lounge, Jennifer Evans remained with and close by defendant Turner. Bishop Dep. at 1542 (Pls.' Ex. in Response to Ds.' Summ. J.

---

1. Defendants VHC and Radisson concede in their answers to the complaint that VHC owned and operated the Bayou Lounge. Radisson's Answer to Complaint ¶¶ 7–8; VHC's Answer to Complaint ¶¶ 7–8. However, the relationship between defendants VHC and Radisson remains somewhat unclear at this juncture. Plaintiffs contend that, based on agency principles, defendant Rad-

isson can be held liable for any negligence on the part of defendant VHC. At oral argument on the instant motions, defendants stated that the two entities had, at all relevant times, a franchise relationship. Given the court's ruling herein, the status of the relationship between VHC and Radisson need not be further clarified or verified.

Motion). Plaintiffs allege that Brown told Kristin Bishop ("Bishop"), a waitress at the Bayou Lounge, that he would entice Jennifer Evans from the premises, so that Turner and Brown could take advantage of her sexually.[2] At approximately 1:25 a.m., Jennifer Evans left the Bayou Lounge with Turner. Bishop Dep. at 12 (Ex. A to Memo. in Support of Ds.' Summ. J. Motion). Sometime after leaving the Bayou Lounge, Turner and Brown raped and killed Jennifer Evans. Plaintiffs allege that the criminal acts took place, or at least began, in the parking lot adjacent to the Radisson Virginia Beach Hotel. Turner and Brown are currently serving prison sentences in a Virginia state penitentiary for these crimes.

Plaintiffs initiated this suit on June 18, 1997. An amended complaint was filed on July 30, 1997.[3] The three plaintiffs are Donald G. Wise, administrator of the estate of Jennifer Evans; Edd A. Evans, father of Jennifer Evans; and, Delores P. Evans, mother of Jennifer Evans. The amended complaint named five defendants: the United States; Billy Joe Brown ("Brown"); Dustin A. Turner ("Turner"); Virginia Hotel Corporation (t/a Radisson Hotel Virginia Beach) ("VHC"); and Radisson Hotels International, Incorporated ("Radisson"). Plaintiffs are suing the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680. Plaintiffs are suing the remaining defendants for wrongful death under Virginia tort law.

Plaintiffs are suing the United States because, at the time of the incident, Turner and Brown were members of a Navy SEAL (SEa Air Land) team.[4] Plaintiffs allege that but for this training, defendants Turner and

Brown would not have raped and killed Jennifer Evans. Plaintiffs allege that the SEAL training program produces "violent side effects," according to at least one government study. Amended Complaint ("Am.Compl.") at 5, ¶ 19. Plaintiffs further allege that the purpose of SEAL training is to turn the trainee into a "lethal weapon," and to instill in the individual "a sense of invincibility as well as euphoria, implying that he can do no wrong." Id. at 5, ¶ 20. On this view, the United States "by virtue of the special and lethal nature of said training ... had a special obligation to protect the plaintiff's decedent." Id. at 6, ¶ 22.

The amended complaint alleges that, prior to the night of June 18, 1995, Brown exhibited violent tendencies, about which the United States knew or should have known. Prior to his enlistment in the Navy, Brown was allegedly discharged from the United States Coast Guard for assaulting a superior officer. Id. at 6, ¶ 24. Despite Brown's dishonorable discharge, the United States "negligently" allowed Brown to enlist in the Navy. Id. at 6, ¶ 25. By subsequently training Brown as a SEAL, plaintiffs contend that the United States created "not merely a lethal weapon, but a highly volatile lethal weapon which should not have been released in public." Id. at 6, ¶ 26.

The amended complaint also alleges that Turner and Brown had a "propensity" to engage in group sex with a female, and the United States knew or should have known of this propensity; other members of the men's SEAL team, including their supervisors, allegedly knew that such incidents had previously occurred in Navy barracks. Id. at 6,

---

**2.** In her deposition, Bishop denied that Turner or Brown made any statement to her about having sex with Jennifer Evans. Bishop Dep. at 33 (Ex. A to Memo. in Support of Ds.' Summ. J. Motion).

**3.** Plaintiffs' attorney represented to the court that an amended complaint was tendered to the Clerk's Office and served on all defendants, except the United States, on June 19, 1997. The Clerk's Office records show receipt of the amended complaint on September 8, 1997. Prior to that date, all defendants except the government filed answers to the amended complaint and motions to dismiss the amended complaint. In an order dated October 2, 1997, a United States

magistrate judge ordered the amended complaint be filed *nunc pro tunc* on July 30, 1997.

The amended complaint is different from the original complaint in two significant respects. First, the amended complaint seeks different relief than found in the original complaint. Second, the amended complaint alleges that the United States owed a special duty to Jennifer Evans, by virtue of the nature of Navy SEAL training, an allegation not found in the original complaint.

**4.** The SEALs are an elite special forces unit within the United States Navy.

¶ 27. According to plaintiffs, Turner's and Brown's supervisors knew the two men were "incorrigible," and knew or should have known that they were unfit for SEAL training. *Id.* at 6, ¶ 28.

Plaintiffs are suing the hotel defendants on two theories of liability.[5] First, plaintiffs argue that defendants breached a duty to warn or protect Jennifer Evans from the known dangers posed by Turner and Brown. Alternatively, plaintiffs argue that defendants breached their duty as hotel owners and operators to provide for their guests' safety. Plaintiffs claim that defendants' negligence proximately caused Jennifer Evans' death.

Plaintiffs seek monetary damages, including but not limited to the following:

> sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent, compensation for reasonably expected loss of income of the decedent and services, protection, care and assistance provided by the decedent, reasonable funeral expenses and travel, lodging, transportation and incidentals of the criminal trial proceeding.

*Id.* at 7, ¶ 30. Plaintiffs seek $5 million in compensatory damages, $10 million in punitive damages from defendants Turner and Brown, and the costs of suit. *Id.* at 7, ¶ 31.

On July 30, 1997, defendant VHC filed an answer to the amended complaint, a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and a memorandum in support of its motion to dismiss. On August 4, 1997, defendant Radisson filed an answer to the complaint, a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and a memorandum in support of its motion to dismiss.

On August 14, 1997, plaintiffs submitted a memorandum in opposition to defendants VHC and Radisson's motions to dismiss. On August 26, 1997, VHC and Radisson jointly submitted a reply brief in response to plaintiffs' memorandum in opposition to their motions to dismiss.

On September 30, 1997, defendant United States filed a motion to dismiss the original complaint, and a memorandum in support of its motion to dismiss the original complaint.[6] On November 3, 1997, plaintiffs submitted a response to the United States' motion to dismiss the original complaint. On December 30, 1997, the United States filed a motion to dismiss the amended complaint, and a memorandum in support of the motion, as well as a reply to plaintiffs' response to the United States' motion to dismiss the original complaint. On January 23, 1998, plaintiffs submitted a response to defendant United States' motion to dismiss the amended complaint.

On February 10, 1998, defendants VHC and Radisson jointly filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, accompanied by a memorandum in support of the motion. On February 23, 1998, plaintiffs submitted a response to the motion for summary judgment. Defendants submitted a reply to plaintiffs' response to the motion for summary judgment on February 27, 1998.

A hearing on the four motions to dismiss and the motion for summary judgment was held on March 19, 1998. The matter is now ripe for decision by the court.

---

5. In addition to the two theories discussed herein, plaintiffs initially attempted to hold defendants liable on a "dram shop" theory of liability. On this theory, a seller of alcoholic beverages may be held liable for injuries sustained as a result of the intoxication of the vendor's patron. Plaintiffs subsequently withdrew this argument, because Virginia law does not recognize "dram shop" liability. *See Byrd v. Gate Petro. Co.,* 845 F.2d 86, 88 (4th Cir.1988); *Williamson v. Old Brogue, Inc.,* 232 Va. 350, 350 S.E.2d 621, 623 (1986).

6. Defendant United States based its motions to dismiss on Rules 12(b)(1), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure. Given that the parties did not argue the Rule 12(b)(3) motion at the hearing, and the fact that the court grants defendant United States' motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), the court finds it unnecessary to address the Rule 12(b)(3) motion.

## II. Analysis

### A. United States' Motions to Dismiss

The United States filed a motion to dismiss the original complaint, and a motion to dismiss the amended complaint. As discussed below, the court GRANTS defendant's motions to dismiss, on two alternative bases. First, section 2680(h) of the Federal Tort Claims Act ("FTCA") bars plaintiffs' claim. Second, even if section 2680(h) did not bar plaintiffs' claim, plaintiffs fail to state a cause of action under the FTCA upon which relief may be granted.

### 1. Standard of Review

The United States presents one argument that implicates both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. The government attacks the court's subject matter jurisdiction by arguing that plaintiffs have failed to state a cause of action under the FTCA.

With regard to the United States' Rule 12(b)(1) motion challenging jurisdiction, the burden is on the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). A motion under Rule 12(b)(1) may attack subject matter jurisdiction in two different ways. In the first, a Rule 12(b)(1) motion may attack the complaint on its face, asserting simply that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *Adams*, 697 F.2d at 1219. If such is the case, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.* The government's motion falls into this category.[7] The United States assumes the correctness of the facts pled in plaintiff's complaint and amended complaint. The government then notes that the claim against it was brought under the Federal Tort Claims Act, but asserts that, because plaintiffs have failed to state a proper claim under the Act, they have thereby failed to allege facts upon which subject matter jurisdiction can be based.

In deciding a Rule 12(b)(6) motion for failure to state a cause of action upon which relief can be granted, the court must accept the factual allegations in the complaint and construe them in the light most favorable to the non-moving party. *Trageser v. Libbie Rehabilitation Center, Inc.*, 590 F.2d 87, 89 (4th Cir.1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). A motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). If, assuming the facts alleged in the complaint to be true, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations, granting a Rule 12(b)(6) motion is proper. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 872 (4th Cir.1989). A court should not dismiss a complaint, even if it appears on the face of the pleadings that the chance of "recovery is remote and unlikely." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In deciding a Rule 12(b)(6) motion, the court may rely only upon the allegations in the complaint and those documents attached as exhibits or incorporated by reference. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683; *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 31 (4th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986).

---

7. In the alternative, a Rule 12(b)(1) motion may attack "the existence of subject matter jurisdiction, quite apart from the pleadings." *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977); *see Adams*, 697 F.2d at 1219.

### 2. *Section 2680(h) of FTCA Bars Suit*

In support of its motions to dismiss, the government first argues that the doctrine of sovereign immunity deprives the court of jurisdiction over plaintiffs' claim. In general, the federal government, as sovereign, is immune from suit. This immunity can only be waived by Congress, and any such waivers must be strictly construed. *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Radin v. United States*, 699 F.2d 681, 685 (4th Cir.1983). The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, is a limited waiver of sovereign immunity. The FTCA provides that

> the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

The Act did not waive the sovereign immunity of the United States in all respects, however. Congress was careful to exempt from the Act's broad waiver of immunity several important classes of tort claims. Of particular relevance here, in section 2680(h) of the FTCA, Congress carved out an exception to the government's waiver of sovereign immunity. Section 2680(h) provides that the Act shall not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). As with all provisions of the FTCA, the "intentional torts" exemption set forth in section 2680(h) "must be strictly construed in favor of the sovereign." *Thigpen v. United States*, 800 F.2d 393, 394 (4th Cir.1986) (citing *Garcia v. United States*, 776 F.2d 116, 118 (5th Cir. 1985)).

It is well-settled that section 2680(h) bars claims in which the claimant attempts to hold the United States directly liable for an assault and battery committed by a government employee. For example, in *Stepp v. United States*, 207 F.2d 909 (4th Cir.1953), suit was brought against the United States after an army guard on duty shot and killed a civilian seaman who had refused to halt for an investigation of a package he was carrying. The court found that the shooting constituted the use of excessive force, and thus constituted an assault and battery within the meaning of section 2680(h). *Id.* at 911. The court held that the United States could not be held liable for the actions of the army guard, though, because the claim came within the "assault and battery exception" set forth in section 2680(h). *Id.* at 912. More recently, in *Gay v. United States*, 739 F.Supp. 275 (D.Md.1990), the patient of a federal health care facility brought an action against the United States to recover for an indecent assault by a health care worker. The court held that, to the extent plaintiff attempted to hold the United States directly liable for the health care worker's intentional tort, the claim was clearly barred by section 2680(h). *Id.* at 276 (citing to *Sheridan v. United States*, 487 U.S. 392, 396–397, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988)).

In the instant case, Turner and Brown's sexual assault of Jennifer Evans clearly constitutes a battery, and both men were government employees at the time they committed the tort. Thus, to the extent that plaintiffs attempt to hold the United States directly liable, on a respondeat superior theory, for Turner and Brown's actions, the court holds that section 2680(h) of the FTCA clearly bars the claim.

Plaintiffs' claim alleging negligence on the part of Navy personnel who hired, trained, and supervised Turner and Brown requires a more in-depth analysis.[8] The analysis prop-

---

8. In the pleadings, plaintiffs do not specify the legal theory underlying the claim against the United States (e.g., failure to warn, negligent supervision, negligent hiring, negligent retention, negligent training). All of the allegations set forth in the amended complaint relate to the employment relationship between the United States, Navy personnel, and Turner and Brown;

erly begins with the Supreme Court's decision in *United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985). In *Shearer*, the mother of an army private who was kidnaped and murdered by another army private brought suit against the United States under the FTCA. Plaintiff claimed the United States Army knew the assailant was dangerous, yet negligently failed to warn other persons that he was at large. *Id.* at 54, 105 S.Ct. 3039. The district court rendered summary judgment for the government, and the Third Circuit reversed. The Supreme Court held that the claim was barred by the *Feres* doctrine, which bars soldiers from recovering under the Federal Tort Claims Act for injuries arising out of or in the course of activity incident to service. *Id.* at 58, 105 S.Ct. 3039. A plurality of four justices held in dicta that the claim was likewise barred by section 2680(h) of the Federal Tort Claims Act, because, on its face, the broad language of section 2680(h) bars all claims stemming from a battery committed by a government employee. *Id.* at 55, 105 S.Ct. 3039. Writing for the plurality, Chief Justice Burger expressed the view that

> [r]espondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims for assault or battery; in sweeping language it excludes any claim arising out of assault or battery. We read the provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee. Thus, 'the express words of the statute' bar respondent's claim against the Government.

*Id.* (citing *United States v. Spelar*, 338 U.S. 217, 219, 70 S.Ct. 10, 94 L.Ed. 3 (1949)).

After *Shearer*, numerous courts took the position that section 2680(h) should be read broadly, effectively barring any claim involving an assault or battery, at least where a government employee committed the intentional tort. *See Johnson v. United States*, 788 F.2d 845, 850–854 (2d Cir.1986); *Thigpen*

*v. United States*, 800 F.2d 393, 395 (4th Cir.1986); *Hoot v. United States*, 790 F.2d 836, 838, (10th Cir.1986); *Garcia v. United States*, 776 F.2d 116, 118 (5th Cir.1985); *Hughes v. United States*, 662 F.2d 219, 220 (4th Cir.1981). Other courts, however, read the exception more narrowly, refusing to bar claims alleging antecedent governmental negligence (e.g., negligent hiring, negligent supervision, negligent failure to protect) which permitted a government employee to commit an assault or battery. *See, e.g., Doe v. United States*, 838 F.2d 220, 223 (7th Cir.1988); *Kearney v. United States*, 815 F.2d 535, 537 (9th Cir.1987); *Bennett v. United States*, 803 F.2d 1502, 1504 (9th Cir. 1986).

In 1988, the Supreme Court's decision in *Sheridan v. United States*, 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988), clarified, to some extent, the scope of the assault and battery exception of section 2680(h). In *Sheridan*, the plaintiffs were shot by an off-duty navy corpsman, who was employed at the Bethesda Naval Hospital. Prior to the shooting, Navy personnel had found the corpsman wandering around in a drunken stupor on hospital grounds, carrying a rifle. Instead of restraining the corpsman, the Navy personnel fled the scene, and the corpsman subsequently shot his rifle into a passing car, injuring the plaintiffs. *Id.* at 394, 108 S.Ct. 2449.

The plaintiffs in *Sheridan* alleged that the government had been negligent in failing to restrain the corpsman, who was drunk and carrying a weapon on Navy property, in violation of Navy regulations. The government defended on the ground that the plaintiffs' claim was barred by the assault and battery exception set forth in section 2680(h) of the FTCA. Recognizing that the circuit courts were split on the issue, the Supreme Court granted certiorari to decide whether plaintiff's claim was one "arising out of" an assault or battery, so as to be barred by section 2680(h). *Id.* at 396, 108 S.Ct. 2449.

---

plaintiffs do not allege a breach of "some separate duty independent from the employment relation." *Sheridan*, 487 U.S. at 401, 108 S.Ct. 2449. Given the nature of the allegations set forth in

the pleadings, the claim is properly characterized as a negligent hiring, retention, training and/or supervision claim.

The Court in *Sheridan* concluded that the plaintiffs' claim was not barred by section 2680(h). *Id.* at 403, 108 S.Ct. 2449. However, the Court carefully limited its holding to the facts of the case before it. The Court explicitly declined to decide whether the 2680(h) exception bars claims for negligent hiring, training and/or supervision. *Id.* at 403, n. 8, 108 S.Ct. 2449. The Court explained that "it is not appropriate in this case to consider whether negligent hiring, negligent supervision, or negligent training may ever provide the basis for liability under the FTCA for a foreseeable assault or battery by a Government employee." *Id.*

Instead, the Court in *Sheridan* focused on whether the assault and battery in question fell within the scope of the FTCA's general waiver of sovereign immunity in the first place. *Id.* at 400, 108 S.Ct. 2449. The Court remanded the case for a determination of whether the United States could be held liable to the plaintiff under Maryland state law, if the United States were a private person under like circumstances.[9] *Id.; see* 28 U.S.C. ¶ 1346(b).

Although the majority in *Sheridan* declined to address the section 2680(h) issue raised on certiorari, Justice Kennedy in his concurring opinion took the position that section 2680(h) bars claims alleging negligent hiring, training, and/or supervision. In Justice Kennedy's view, "a court must ascertain whether the alleged negligence was the breach of a duty to select or supervise the employee-tortfeasor or the breach of some separate duty independent from the employment relation." *Id.* at 406, 108 S.Ct. 2449 (Kennedy, J., concurring). Under this test, "[i]f the allegation is that the Government was negligent in the supervision or selection of the employee and that the intentional tort occurred as a result, the intentional tort exception of § 2680(h) bars the claim." *Id.* at 405, 108 S.Ct. 2449. Justice Kennedy expressed concern that, to hold otherwise, "litigants could avoid the substance of the exception because it is likely that many, if not all, intentional torts of Government employees

plausibly could be ascribed to the negligence of the tortfeasor's supervisors," thus frustrating the purposes of the section 2680(h) exception. *Id.*

█ The issue of negligent hiring, supervision, and training, raised but not resolved in *Sheridan,* remains a problematic one and is central to this court's disposition of the case at bar. While the courts' interpretations of section 2680(h) are far from uniform, the Fourth Circuit has indicated that such claims are barred by section 2680(h), as discussed below.

Most recently, the Fourth Circuit commented on the scope of the section 2680(h) exemption in *Perkins v. United States,* 55 F.3d 910 (4th Cir.1995). The plaintiff in *Perkins* brought a wrongful death action against the United States pursuant to the FTCA, after a worker died attempting to remove equipment from a mine to satisfy an Internal Revenue Service seizure order. At issue in *Perkins* was whether the plaintiff's claim was barred by section 2680(c) of the FTCA, which deprives federal courts of jurisdiction over claims "arising in respect of assessment or collection of any tax or customs duty." 28 U.S.C. § 2680(c). In deciding the § 2680(c) issue, the Fourth Circuit cited to case law interpreting and applying the assault and battery exception set forth in section 2680(h) of the Act. As held by the Fourth Circuit, "[a]n allegation of 'negligent supervision' will not render an otherwise unactionable claim actionable so long as the negligent supervision claim depends on activity of the supervised agent which is itself immune." *Id.* at 916 (citing *Thigpen v. United States,* 800 F.2d 393, 395 (4th Cir.1986)). The court reasoned that if the United States is immune from suit for the actions of the direct tortfeasor, "it is also immune from suit for his negligent supervision because, without his underlying activities and violations, there would be no cause of action for negligent supervision at all." *Id.*

---

**9.** On remand, the district court determined that the United States was not liable for the alleged negligence of Navy personnel, because, under Maryland law, the government owed no duty to protect plaintiffs against intentional criminal acts of third persons. *Sheridan v. United States,* 773 F.Supp. 786, 787 (D.Md.1991), *aff'd,* 969 F.2d 72 (4th Cir.1992).

Nor would the Fourth Circuit allow the plaintiff in *Perkins* to proceed on a "negligent retention" theory. Again analogizing to case law interpreting section 2680(h) of the FTCA, the court held that "[t]he rule regarding negligent supervision claims discussed above applies equally to negligent retention claims." *Id.* (citing *Hughes v. Sullivan*, 514 F.Supp. 667, 670 (E.D.Va.1980)). Thus, the Fourth Circuit made it clear in *Perkins* that, although *Thigpen* and *Hughes* pre-date the Supreme Court's decision in *Sheridan*, these cases remain the law in the Fourth Circuit. Accordingly, this court is bound to follow this precedent in deciding the case at bar.

In *Hughes v. Sullivan*, 514 F.Supp. 667 (E.D.Va.1980), *aff'd sub nom*, 662 F.2d 219 (4th Cir.1981) (per curiam), a postal employee, while on his mail route, lured two young girls into his postal truck and committed sexual indecencies. He had previously pled guilty to a similar offense. The parents of the two victims brought an action against the government under the FTCA, alleging the postal supervisor was negligent in allowing the employee to remain in a position where he came into contact with young children. *Hughes*, 662 F.2d at 219. The district court held the claim was barred by section 2680(h) of the FTCA, and the Fourth Circuit affirmed. *Id.* at 220. The district court reasoned that, although the complaint alleged that the United States negligently retained a postal worker despite knowledge of his "bad" propensities, the proximate cause of the injury was not the negligent retention of the worker, but the willful and intentional act of the postman. *Hughes*, 514 F.Supp. at 670. Thus, the district court concluded that the cause of action arose out of a battery committed by a government employee, and not from the negligence of the postal supervisor. *Id.* Since the "assault and battery exception" in section 2680(h) clearly applied to the postman's acts, the court held that section

2680(h) would likewise bar the negligent retention claim. *Id.* at 670.

In *Thigpen v. United States*, 618 F.Supp. 239 (D.S.C.1986) *aff'd*, 800 F.2d 393 (4th Cir. 1986), a naval corpsman committed sexual indecencies with two minor girls while they were hospitalized in a naval hospital. An action was brought on behalf of the children pursuant to the FTCA, alleging that the Navy had negligently supervised the offending corpsman, and such negligence proximately caused the assault. *Id.* at 394. As in *Hughes*, the district court held the claim was barred by section 2680(h), and the Fourth Circuit affirmed. *Thigpen*, 800 F.2d at 397. The court reasoned that, since the injury resulted from the intentional tort of the corpsman, and not from a lack of supervision by the government, the claim was one "arising out of" an assault and battery. *Id.* at 395.

In the case at bar, section 2680(h) of the FTCA clearly applies to Turner and Brown's actions.[10] Since plaintiffs' entire cause of action hinges upon the underlying intentional tort committed by the two men, the claim alleging negligent hiring, retention, training, and supervision is likewise barred by section 2680(h), as interpreted in *Thigpen* and *Hughes*. Turner and Brown's assault is "an integral part of plaintiffs' action." *Hughes*, 514 F.Supp. at 670. Without Turner and Brown's underlying criminal acts, there would be no cause of action for negligence. *See Perkins*, 55 F.3d at 916. Since "the factual predicate of plaintiffs' claim is one of assault and battery, adroit pleading of negligence or breach of duty on the part of government supervisors will not suffice to circumvent the statutory mandate." *Thigpen*, 800 F.2d at 395. Accordingly, the court GRANTS the United States' motions to dismiss for lack of subject matter jurisdiction and for failure to state a cause of action, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[11]

10. *See supra* at 542.

11. The court also notes that it remains unclear whether plaintiffs have exhausted their administrative remedies, as required by section 2675(a) of the FTCA. Although plaintiffs submitted evidence that a claim was filed with the proper administrative agency, the record does not indicate whether the agency made a final determination on the claim. A plaintiff's failure to submit a claim and exhaust administrative remedies deprives federal courts of jurisdiction over the claim pursuant to the FTCA. 28 U.S.C. § 2675(a); *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir.1995).

### 3. No Liability under Virginia Tort Law

Alternatively, even if section 2680(h) of the Federal Tort Claims Act did not bar plaintiffs' claim, plaintiffs still have failed to state a cause of action upon which relief can be granted. Section 1346(b) of the Federal Tort Claims Act vests exclusive jurisdiction in the district courts over tort claims brought against the federal government, but only where "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). For the reasons stated below, the court finds that the United States, if it were a private person under like circumstances, would not be liable to plaintiffs under Virginia law.[12]

Plaintiffs allege the United States had a duty to control Turner and Brown so as to prevent harm to others, including Jennifer Evans.[13] Specifically, plaintiffs claim that a special relationship, or "quasi-parental relationship," existed between the United States and Turner and Brown, which relationship created a duty on the part of the United States to control Turner and Brown.[14] Plaintiffs further allege that the United States breached this duty by exercising inadequate supervision over Turner and Brown, and that as a result, Turner and Brown raped and killed Jennifer Evans.[15]

The general rule is that there is "no duty to control the conduct of third persons in order to prevent harm to another.... This is especially the case when the third person commits acts of assaultive criminal behavior because such conduct cannot reasonably be foreseen." *Marshall v. Winston*, 239 Va. 315, 389 S.E.2d 902, 904 (1990). The Commonwealth's high court has carved out an exception to the general rule, however. In *Nasser v. Parker*, 249 Va. 172, 455 S.E.2d 502 (1995), the court cited to section 315A of the Restatement (Second) of Torts in holding that the "duty to protect one from the wrongful acts of a third party may exist because of a 'special relationship' between the defendant and the third party." *Id.* at 503; *see* Restatement (Second) of Torts § 315A (1965). The court then looked to section 319 of the Restatement for a description of the type of section 315(a) special relationship required:

> One who takes charge of a third person whom he knows or should know to be

---

Since the United States did not pursue this issue, it is not addressed further by this court.

**12.** In the memoranda and briefs submitted to the court, all parties in this action analyzed the issue under Virginia law, thereby implicitly conceding the state law applicable to this case. Moreover, plaintiffs have not alleged that any of the relevant conduct occurred outside the state of Virginia. Accordingly, the court analyzes the claim under Virginia law.

**13.** To the extent plaintiffs attempt to hold the United States directly liable, on a theory of respondeat superior, for the criminal acts of Turner and Brown, the court clearly lacks subject matter jurisdiction over the claim. Section 1346 of the FTCA vests the district courts with jurisdiction over claims against the United States "for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment*...." 28 U.S.C. § 1346(b)(1) (emphasis added). It is clear from the record that Turner and Brown were not acting within the scope of their duties as Navy SEAL trainees when they assaulted Jennifer Evans.

**14.** Insofar as plaintiffs allege that SEAL training turned Turner and Brown into "lethal weapons," the claim does not have legal import. It does not constitute a "negligent training" claim, because plaintiffs do not allege the training was faulty or lacking in any way. Rather, plaintiffs allege that "by virtue of the special and lethal nature of [SEAL] training" itself, the United States owed a special obligation to protect Jennifer Evans.Am.Compl. at 6, ¶ 22. This is not a recognized theory of liability under the law. If it were, then the "world at large" would be a "foreseeable victim" of any Navy SEAL trainee, and such result is inconsistent with Virginia law. *See, e.g., Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 401 S.E.2d 878, 883 (1991); *infra* at 550.

**15.** To the extent that plaintiffs contend that the United States is liable because it negligently failed to take charge of Turner and Brown, they likewise do not state a viable cause of action. Based on the Virginia authorities reviewed herein, *infra* at 26–36, a defendant in Virginia generally cannot be held liable for failing to take control over another; he can only be held liable for taking charge of another, and then exercising that assumed control negligently. *See Sage v. United States*, 974 F.Supp. 851, 862 (E.D.Va. 1997).

likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

*Fox v. Custis,* 236 Va. 69, 372 S.E.2d 373, 376 (1988) (quoting Restatement § 319); *see Nasser,* 455 S.E.2d at 504 (observing that courts must consider Restatement §§ 315(a) and 319 together when "determining whether one has a duty concerning the conduct of a third person").

Thus, a special relationship did not exist between the United States and Turner and Brown, unless the government "took charge of or exercised control over [them] during the relevant time period." *Fox,* 372 S.E.2d at 376. The court finds that a special relationship did not exist here because the United States did not exercise over Turner and Brown the type of control contemplated by the Virginia Supreme Court when it developed the "take charge" standard, as detailed below.

The Virginia Supreme Court has described, in a series of decisions, the type of relationship that must exist before it can be said that a defendant has taken charge of or exercised control over a third party such that a section 319 "special relationship" exists. In *Nasser v. Parker,* 249 Va. 172, 455 S.E.2d 502, the court held that a doctor-patient or hospital-patient relationship, without more, did not constitute a special relationship so as to create liability on the part of the medical care provider for the patient's actions.[16] 455 S.E.2d at 506. *Nasser* involved a voluntary psychiatric inpatient with a history of mental illness and violent acts towards women who rejected him. While under psychiatric care, the patient made threats against Lemon, a former girlfriend who had just spurned him. Although the treating psychiatrist knew of his patient's violent history and recent threats, he made no attempt to prevent the patient from checking himself out of the hospital, or to warn Lemon of the patient's release. Shortly thereafter, the patient murdered Lemon. *Id.* at 503.

The court in *Nasser* held that merely accepting one as a patient and assuming responsibility for his proper treatment does not impose upon the medical care provider a duty to protect others from the dangers posed by the patient, even when the patient specifically warns that he intends to harm another. *Id.* at 506. In dismissing the suit, the court rejected the argument that the doctor "took charge of Edwards within the meaning of Restatement § 319 by accepting [him] as his patient for the purpose of providing prolonged treatment ..., prescribing medication ... and arranging for [his] admittance to [the] Hospital." *Id.* Nor did the hospital take charge of Edwards by admitting him as a patient for the purpose of providing continued and prolonged psychiatric treatment. *Id.*

Two other decisions of the Virginia Supreme Court make clear that a defendant cannot be held to have taken charge of another, unless the defendant had some heightened obligation to monitor and direct the party's movements. In *Fox v. Custis,* 236 Va. 69, 372 S.E.2d 373, a parolee with a history of mental instability and violence went on a multi-week crime spree culminating in arson, rape, and capital murder. During that time, the criminal's parole officers took no action to have their parolee reincarcerated; indeed, at the time, they did not know the seriousness of his criminal violations. 372 S.E.2d at 374. The victims of the parolee's one-man crime wave sued the parole officers, asserting that the officers had breached their duty, as set forth in Restatement § 319, to supervise former inmates properly. *Id.*

The Virginia high court rejected plaintiffs' arguments, holding that the parole officers owed them no such duty and were not liable for the parolee's criminal actions. *Id.* at 377. While the court recognized that the parole officers had a statutory duty to "supervise and assist" their parolees, the court found that this duty "does not mean to assert custody in the sense that the parolee is in the personal care and control of the officer." *Id.* at 376. The court was also well aware that special terms and conditions are placed on a

16. Similarly, plaintiffs can cite no authority to suggest that the mere existence of a military

relationship creates a section 319 "special relationship," and this court declines to impose one.

parolee's freedom: "parolees ordinarily are essentially free to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer as they occur or are planned." *Id.* Nonetheless, the court held that, because the controlling statute "does not contemplate continuing hourly or daily dominance and dominion," the defendant parole officers "did not take charge of or exercise control over [the parolee] within the meaning of accepted rules of tort law articulated in Restatement §§ 315(a) and 319." *Id.*

The case of *Dudley v. Offender Aid & Restoration of Richmond, Inc.,* 241 Va. 270, 401 S.E.2d 878 (1991), illustrates the type of custodial relationship that must exist for section 319 liability to attach. In *Dudley,* a convicted felon, Spencer, was serving the remainder of his sentence in a halfway house being negligently operated by the defendant. One evening, Spencer climbed out the window of his room at the halfway house, broke into a nearby apartment, and raped and killed a woman. *Id.* at 880. In holding that the defendant-halfway house owed the victim an actionable duty, the court noted that the case before it was distinguishable from *Fox* "in two crucial respects." *Id.* at 881. First,

> Spencer, unlike the parolee in *Fox,* had not served his period of confinement and had not been released into the community subject only to "supervision and assistance" of parole officers. Rather, Spencer was a felon committed to the penitentiary and actively serving a sentence.... He was, when received by the OAR [halfway house] in the custody of the Department of Corrections.

*Id.* The court found that a "special relationship" existed between the halfway house and the assailant, because "[a]nyone assuming that custody from the Department necessarily became 'one who takes charge' within the meaning of Restatement § 319." *Id.*

Second, the court found that the halfway house, under its contract with the Department of Corrections, "undertook a responsibility for very close and continuous supervision" of the assailant which "differed substantially, both in degree and in kind, from the duties imposed upon the parole officers in *Fox.*" *Id.* Specifically, the contract required the halfway house to maintain stringent security and oversight measures. *Id.* In addition, the halfway house was supposed to have adequate sign-out procedures in place to enable it to report to the Department any unauthorized absence of an inmate in excess of two hours' duration. *Id.* at 881–82. Based on the assailant's status as a convicted felon, and the contractual obligations undertaken by the halfway house, the court in *Dudley* held that the halfway house "took charge" of the felon, and could be held liable for his criminal acts. *Id.* at 883.

This court recently applied this line of Virginia cases, in *Sage v. United States,* 974 F.Supp. 851 (E.D.Va.1997). In *Sage,* two shooting victims and the estate of a deceased shooting victim brought suit against the United States under the Federal Tort Claims Act, claiming that the military, through its health care providers, negligently failed to control the assailant, Hill. At the time of the shooting, Hill was an active-duty captain in the United States Army. He was living at home, but was under supervision pending discharge from the Army for mental illness disability. Hill was subject to various supervisory conditions, including checking in by telephone on a daily basis and signing in at the clinic every week. Plaintiffs' claim against the United States was premised on the theory that the United States failed to "supervise, treat, and otherwise care for Hill in such a way as to prevent him from harming others." *Sage,* 974 F.Supp. at 859.

After examining the Virginia authorities discussed herein, this court held in *Sage* that there is no "special relationship" between a hospital and patient which gives rise to a duty to protect others from wrongful acts of the patient, because, under Virginia law, a hospital does not "take charge" or exercise control over a patient. *Id.* at 862. Alternatively, even if the hospital had taken charge of or exercised control over Hill, the court concluded that the hospital-defendants had no duty to prevent Hill's assault, because neither the shooting spree nor the victims

were reasonably foreseeable. *Id.* at 866–67.[17]

■ As explained below, the United States likewise in the case at bar did not "take charge" of or exercise control over Turner and Brown. First, the government does not have a duty to control the actions of an off-duty soldier. The fact that the government has the power to exert complete authority over off-duty servicemen does not create a "special relationship" giving rise to a special duty to control their off-duty actions. *See Louie v. United States,* 776 F.2d 819, 827 (9th Cir.1985). As in *Fox,* defendant in the instant case did not exert "continuous hourly or daily dominance and dominion" over Turner and Brown. *See Fox,* 372 S.E.2d at 376. Turner and Brown were enlisted soldiers who, by virtue of their enlistment, did not lose their right to freedom of movement without the protection of due process. In fact, defendant had less intrusive control over the hourly and daily aspects of Turner and Brown's lives than the psychiatrist and hospital had over their psychiatric inpatient in *Nasser,* where the court still did not find the requisite "special relationship."

Plaintiffs, however, contend that the United States had even more control over Turner and Brown than the defendant halfway house had over the convicted felon in *Dudley.* According to plaintiffs,

> [t]he defendants Brown and Turner were under the supervision and control of the USA to a greater degree than the perpetrator in *Dudley.* The defendants Brown and Turner were stationed on base. They were permitted to leave the base only at the discretion of the USA and their liberty could have been easily restricted.

Pls.' Response to Motion to Dismiss Am. Complaint at 8. Plaintiffs' attempt to analogize this case to *Dudley* is unpersuasive. Subject to military orders or not, Turner and Brown were enlisted soldiers, albeit members of an elite corps of soldiers, and not prisoners. They were free to move about at will during their off-duty hours.

In summary, absent the requisite "special relationship" thereby requiring the United States to "take charge" of Turner and Brown, the United States owed Jennifer Evans no duty to control Turner and Brown so as prevent them from causing her harm. Absent a duty, there can be no liability for negligence. *See, e.g., Fox,* 372 S.E.2d at 375 (holding that "[t]here can be no actionable negligence unless there is a legal duty, a violation of the duty, and consequent damage").

■ Moreover, the plaintiffs cannot recover under the FTCA because the sexual assault committed by Turner and Brown was not reasonably foreseeable to the United States, nor was Jennifer Evans in a class of foreseeable victims. Under Virginia law, one who takes charge of another cannot be liable for a third party's actions, unless the defendant "knew or should have known" that the third party was likely to cause harm. *Marshall v. Winston,* 239 Va. 315, 389 S.E.2d 902, 904 (1990). In *Marshall,* a sheriff and a jailor negligently released a prisoner, Mundy, from jail by mistake, prior to the expiration of his sentence. Earlier, the sentencing judge had expressed his concern that Mundy "might kill himself or a member of the public," if so released. While Mundy should have been in jail serving his original sentence, he robbed and murdered plaintiff's decedent. *Id.* at 903–904.

The Virginia Supreme Court affirmed the trial court's dismissal of the suit. *Id.* at 905. The court reasoned that the plaintiff failed to show the existence of a section 319 special relationship, because he did not allege facts "from which a person could reasonably infer that [defendants] knew or should have known that Mundy would likely cause bodily harm to others if he were not controlled." *Id.* at 904. The court suggested that, although the sentencing judge might have had reason to know that Mundy was likely to cause harm if not controlled, that knowledge could not be imputed to the defendants, who actually exercised control over the prisoner. In ruling that defendants could not be held liable, the court thereby established that liability under

---

17. This court in *Sage* likewise refused to impose a "special relationship" by virtue of the military

relationship, standing alone. 974 F.Supp. at 859 n. 7; *see supra* note 16.

section 319 can only attach if the one who takes charge of another has reason to believe that the third person "would likely cause bodily harm to others if ... not controlled." *Id.*

Like the defendants in *Marshall,* the United States cannot be held liable for Turner and Brown's actions, because the United States did not have reason to know that Turner and Brown were likely to sexually assault and kill a civilian on June 18, 1995. These independent criminal acts were simply not foreseeable. Nothing in the record suggests that the men had committed criminal sexual assaults prior to enlistment in the Navy, or at any time before or during their SEAL training. The only prior bad act described in the pleadings is Brown's alleged assault of a superior officer while serving in the United States Coast Guard, before joining the Navy. There is no indication that this assault was sexual in nature. With regard to plaintiffs' allegation that Brown had engaged in group sex with a female in Navy barracks prior to June 18, 1995, there is no allegation that these sexual acts were not consensual. For these reasons, the court finds that the United States could not have reasonably foreseen that Turner and Brown would commit a sexual assault and kill a civilian, while off-duty and off-base, on June 18, 1995.

Nor was Jennifer Evans a foreseeable victim of Turner and Brown's criminal acts. Under Virginia law, "[t]here is no such thing as negligence in the abstract, or in general.... Negligence must be in relation to some person." *Marshall,* 389 S.E.2d at 905. The scope of the duty "will vary with the circumstances of each case ... [but] it is always a duty owed to a discernible individual, or to a class of which that individual is a member." *Dudley,* 401 S.E.2d at 883. If the facts of the case are such that the third party is a "potential threat to all who come within his reach," then the section 319 duty extends to "an entire class of prospective victims: those who are directly and foreseeably exposed to the risk of bodily harm as a result of defendant's failure to control his dangerous

charge." *Id.* The class of persons to whom a duty is owed will often include persons located "in a given area of danger," but the duty never extends to the "world at large." *Id.*

In the instant case, plaintiffs cannot show that Jennifer Evans was part of any class that was "directly and foreseeably exposed" to a risk of harm. In order to show that any duty on the part of the United States extended to Ms. Evans, plaintiffs must offer some reason that the United States could reasonably have known that Turner and Brown would harm her. This plaintiffs have failed to do. In the only prior bad act described in the pleadings, Brown assaulted a superior officer, not a civilian with whom he had socialized while off-base and off-duty.[18] Nor can it be said that Jennifer Evans was located "in a given area of danger;" Turner and Brown met Jennifer Evans at a hotel bar and then assaulted and killed her, all off the naval base where the men were stationed. To extend any duty to include Ms. Evans would be to extend the duty to the "world at large," a result inconsistent with Virginia law.

For the foregoing reasons, the court finds that the United States did not have a duty to control Turner and Brown so as to protect Jennifer Evans from bodily harm.

### B. VHC's and Radisson's Motion for Summary Judgment

#### 1. Standard of Review

Defendants VHC and Radisson each filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[19] Subsequently, the two defendants jointly filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under Rule 12(b) of the Federal Rules of Civil Procedure,

on a motion asserting the defense numbered (6) for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one

---

**18.** Again, the group sex allegation was not shown, or even alleged, to be an act of force or nonconsensual. *See supra* at 550.

**19.** *See supra* at 541 for detail of standard of review.

for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

Fed.R.Civ.P. 12(b). Thus, where a trial court grants a motion to dismiss after considering matters outside the pleadings, dismissal is treated as summary judgment.

Summary judgment is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. Fed.R.Civ.P. 56(e); *Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. 2548. Such facts must be presented in the form of exhibits and sworn affidavits.

Here, all parties submitted additional materials outside the pleadings, and the court considered these matters in deciding defendant VHC's Rule 12(b)(6) motion to dismiss, defendant Radisson's Rule 12(b)(6) motion, and defendants' joint motion for summary judgment. Accordingly, the court treats the Rule 12(b)(6) motions to dismiss as motions for summary judgment pursuant to Rule 56, and considers them in conjunction with the motion for summary judgment filed jointly by defendants VHC and Radisson.

### 2. *No Duty to Protect Decedent*

Plaintiffs make two arguments in support of their claim against defendants VHC and Radisson. First, plaintiffs contend that defendants breached their duty to take reasonable measures to provide for the safety of their guests, and this negligence proximately caused the death of Jennifer Evans. Alternatively, plaintiffs claim that defendants owed a duty to protect or warn Jennifer Evans from harm, because they knew or should have known that Turner and Brown were likely to assault her, and defendants' breach of this duty proximately caused her death. The court addresses each of the two arguments below.

Plaintiffs first argue that defendants breached their duty as hotel owner-operators to provide for the safety of their guests. Under Section 35.1–28A of the Code of Virginia (1950), as amended,

> [i]t shall be the duty of any person owning or operating a hotel to exercise due care and diligence in providing honest and competent employees and to take reasonable precautions to protect the persons and property of the guests of the hotel.

Plaintiffs argue that Jennifer Evans was entitled to the standard of care imposed by section 35.1–28A of the Virginia Code.

 However, Virginia law recognizes that a hotel owner-operator who operates a bar or restaurant for the accommodation of its guests and the general public may be an innkeeper as to some of the patrons, and a business invitor as to the others. *Alpaugh v. Wolverton,* 184 Va. 943, 36 S.E.2d 906, 908 (1946). As the Virginia Supreme Court has observed,

> [e]very one patronizing or seeking to patronize the facilities of a hotel or inn does not necessarily become a 'guest' of the establishment within the technical meaning of that term.... No one would seriously contend that a casual patron of a barbershop located in a hotel, or one who purchases a newspaper or cigar from a hotel newsstand, or one who uses the pay telephone in the hotel lobby, by virtue of such patronage alone, thereby became a 'guest' of the hotel in a technical sense.

*Id.*

 Accordingly, plaintiffs' reliance on section 35.1–28A is misplaced. The statute imposes a heightened duty of care on the part of hotel owners and operators, but only with regard to hotel guests. There is nothing in the record to suggest that Jennifer Evans was a guest of the Radisson Virginia

Beach Hotel on the night of June 18, 1995. There is no indication that she had rented a room at the hotel, or that she was the guest of a person renting space at the hotel.[20] Rather, Jennifer Evans was on the hotel premises as an invitee of defendants, not as a hotel guest. Immediately prior to Turner and Brown's assault, Jennifer Evans was a patron of a bar located within defendants' hotel; as the Virginia high court has made clear, her patronage of the Bayou Lounge does not rise to the level of "hotel guest." Consequently, Jennifer Evans was not entitled to the level of protection set forth in section 35.1–28A of the Virginia Code.

■ Moreover, section 35.1–28A of the Virginia Code does not impose a duty on hotel owners and operators to protect guests against unforeseeable, intentional criminal acts of third persons. *See Wright v. Webb,* 234 Va. 527, 362 S.E.2d 919, 921 (1987) (refusing to impose a duty upon innkeepers and other common carriers, landlords, and business invitors to protect passengers, tenants, or invitees from criminal acts by third persons). Rather, section 35.1–28A of the Virginia Code serves as a means of "protecting guests from negligent acts by the hotel and maybe even criminal acts by hotel employees." *Rosen v. Red Roof Inns, Inc.,* 950 F.Supp. 156, 159 (E.D.Va.1997). The proper standard to apply in analyzing innkeepers' and business invitors' duty with regard to intentional criminal acts of third persons was articulated by the Virginia Supreme Court in *Wright v. Webb. Rosen,* 950 F.Supp. at 158.

The facts of *Wright* are strikingly similar to the facts of the case at bar. The defendants owned a motel and the parking lot adjacent to the motel. The parking lot was made available to motel guests and patrons of a dinner theater located next to the lot. The plaintiff was criminally assaulted in the parking lot, after attending a function at the dinner theater. Unlike the instant case, the defendants had prior notice that a criminal assault was likely to occur on the premises. Prior to the assault, several larcenies had occurred, an average of once or twice per month, in the motel rooms and in vehicles parked in the lot, including a double murder in the parking lot the year prior to plaintiff's assault.

As in the instant case, the plaintiff in *Wright* argued that the defendants did not adequately maintain the safety of the motel parking lot. Plaintiff presented a security expert, just as plaintiffs offer in the case at bar, who testified about other available precautions which might have deterred criminal activity in the parking lot, including fencing, closed-circuit television, a patrol of the premises, and a speed bump. 362 S.E.2d at 920.

Although the facts of *Wright* were more compelling than those alleged in the case at bar, the Virginia Supreme Court refused to hold that the motel owner-operator had a duty to protect the plaintiff against a criminal assault in the parking lot of the motel. The court reasoned that "in ordinary circumstances, acts of assaultive behavior cannot reasonably be foreseen." *Id.* Accordingly, the court held that

> a business invitor, whose method of business does not attract or provide a climate for assaultive crimes, does not have a duty to take measures to protect an invitee against criminal assault unless he knows that criminal assaults against persons are occurring, or are about to occur, on the premises which indicate an imminent probability of harm to an invitee.

*Id.* at 922. Thus, the court carved out a narrow exception to Virginia's no-duty rule, where the business invitor has "notice of a specific danger just prior to the assault." *Id.* at 922. Despite the rash of larcenies in the months preceding plaintiff's assault, the court concluded that the defendants did not possess the requisite knowledge to be held liable for the criminal assault. The court reversed the jury verdict, and entered judgment for defendants. *Id.*

In *Gupton v. Quicke,* 247 Va. 362, 442 S.E.2d 658, 659 (1994), the Virginia Supreme Court revisited the "imminent harm exception" established in *Wright.* The plaintiff in

---

**20.** Nor does the record suggest that Turner and/or Brown were guests of the Radisson Virginia Beach Hotel on the night of June 18, 1995.

*Gupton* sued a tavern owner for injuries sustained in an armed conflict with another patron on the tavern's premises. Just prior to the armed conflict, employees of the tavern had learned of an argument between the plaintiff and the assailant. The employees had also witnessed the assailant making threats of bodily harm against the plaintiff. Although the employees ousted the assailant from the tavern on account of these threats, he was subsequently permitted to re-enter the tavern. The armed conflict ensued shortly thereafter. On these compelling facts, the court held that defendant could be held liable for injuries stemming from the criminal conduct, because the defendant, through its agents, knew that an assault was about to occur in the tavern, which indicated an "imminent probability of harm" to the plaintiff. *Id.* (quoting *Wright*, 362 S.E.2d at 922).[21]

In the case at bar, plaintiffs contend that defendants, through their agents, knew or should have known that Turner and Brown were about to commit a criminal assault on the premises, which indicated an imminent probability of harm to Jennifer Evans. Specifically, plaintiffs allege that, just prior to the assault, Brown told Kristin Bishop, a waitress at the Bayou Lounge, that he intended to entice Jennifer Evans from the premises, so that he and Turner could take advantage of her sexually.[22] Based on this knowledge, plaintiffs argue that defendants VHC and Radisson had a duty to protect Jennifer Evans from the dangers posed by Turner and Brown, and breach of this duty proximately caused her death.

Whether a duty exists is a question of law for the court to decide. *Burns v. Johnson*, 250 Va. 41, 458 S.E.2d 448, 451

(1995). For the reasons stated below, the court finds, as a matter of law, that defendants VHC and Radisson did not owe a duty to protect Jennifer Evans from the intentional criminal acts of defendants Turner and Brown, because defendants VHC and Radisson did not know that the assault was about to occur on the hotel premises which indicated an imminent probability of harm to Jennifer Evans.

Kristin Bishop was employed as a waitress at the Bayou Lounge in June, 1995. Bishop Dep. at 4 (Ex. A to Memo. in Support of Ds.' Summ.J. Motion). However, on the night of June 18, 1995, Bishop was not on duty; she was merely a patron of the Bayou Lounge, just as any member of the general public would be. *Id.* at 8. Knowledge of an employee is only imputed to an employer if it was obtained while acting in the scope of employment and concerning a matter within the scope of that employment. *See England v. American Southern Insurance Co.*, 380 F.2d 137, 140 (4th Cir.1967) (citing *Ohio Farmers Indem. Co. v. Charleston Laundry Co.*, 183 F.2d 682, 684 (4th Cir.1950)); *Standard Oil Co. v. Wakefield's Administrator*, 102 Va. 824, 835, 47 S.E. 830, 832 (1904). Consequently, any knowledge Bishop gained that night regarding the likelihood of a criminal assault cannot be imputed to defendants VHC and Radisson, because it was not gained in the scope of her employment.[23] Likewise, Bishop's alleged knowledge that Brown had engaged in group sex with other women prior to June 18, 1995, cannot be imputed to these defendants, because Bishop did not obtain this information in the scope of her employment. Bishop Dep. at 24 (Ex. A to Memo. in Support of Ds.' Summ.J. Motion).

**21.** Insofar as plaintiffs claim that defendants VHC and Radisson owed a duty to protect Jennifer Evans because operating a bar in and of itself attracts or provides a climate for assaultive crimes, it is clear from *Gupton* that plaintiffs' argument must fail. The mere fact that defendants owned and operated the Bayou Lounge, standing alone, is not enough to create a duty to protect an invitee against criminal assault.

**22.** Aside from the statement which Brown allegedly made to Kristin Bishop, plaintiffs have not alleged any other ways in which defendants

could have known that a criminal assault was about to occur on the premises.

**23.** Furthermore, Bishop denied in her deposition testimony that Brown or Turner expressed to her any intention of having sexual relations with Jennifer Evans, let alone nonconsensual relations. Bishop Dep. at 20, 33 (Ex. A to Memo. in Support of Ds.' Summ.J. Motion). However, for purposes of this motion, the court assumes she did learn of the potential assault.

Moreover, according to Bishop's testimony, nothing in Turner and Brown's appearance or conduct on the night of June 18, 1995, would have given defendants' employees reasonable notice that a criminal assault was about to occur. *See* Bishop Dep. at 1541–43 (Pls.' Ex. in Response to Ds.' Summ.J. Motion). Unlike the situation presented in *Gupton,* neither Turner nor Brown exhibited any violent behavior at the Bayou Lounge. Indeed, the two men appeared to be heavily intoxicated and passive at the Bayou Lounge that night, almost to the point of passing out. *Id.* Finally, Jennifer Evans remained with and close by Turner at the Bayou Lounge throughout the night. *Id.* at 1542. This would reasonably indicate to onlookers that any relations between the two were amicable and consensual.

For the foregoing reasons, under Virginia law, defendants did not have a duty to protect Jennifer Evans against the criminal acts of Turner and Brown. She was not a guest of the hotel to warrant protection under Virginia Code § 35.1–28A. As an invitee, defendants VHC and Radisson did not have the requisite knowledge of imminent harm. Finally, where there is no legal duty to exercise care, there can be no actionable negligence. *See. e.g., Deem v. Charles E. Smith Management, Inc.,* 799 F.2d 944, 945 (4th Cir.1986); *Virginia Ry. & Power Co. v. Winstead's Adm'r.,* 119 Va. 326, 89 S.E. 83, 84 (1916). There are no genuine issues of material fact, and defendants are entitled to judgment as a matter of law.

### III. Conclusion

The court deeply regrets the trauma and loss suffered by the plaintiffs, but finds itself bound to follow Fourth Circuit and Virginia precedent. Accordingly, the court **GRANTS** defendant United States' motions to dismiss, and **GRANTS** the motion for summary judgment filed jointly by defendants Virginia Hotel Corporation and Radisson Hotels International, Incorporated.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for all parties.

It is so **ORDERED.**